## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **TOMEKA C. EDWARDS,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| **TACALA GEORGIA CORP., doing business as TACO BELL, and OLIVIA NORMAN,** | **5:21-cv-00219-TES** |
| *Defendants.* | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' Motion for Summary Judgment [Doc. 24] and

Defendants' Objections to Declarations, or in the Alternative, Motion to Strike [Doc. 28].

## FACTUAL BACKGROUND

Defendant Tacala Georgia Corporation ("Tacala") owns and operates nearly 45

Taco Bell restaurants as a Taco Bell franchisee. [Doc. 24-6, DeFranco Decl., ¶ 3].

Defendant Olivia Norman works for Tacala as an Area Coach, overseeing 8 restaurants,

including those in Macon, Georgia. [Doc. 24-5, Norman Decl., ¶ 2].

Ten years prior to the incidents preceding this action, Plaintiff Tomeka Edwards

worked as an Assistant Leader, under the supervision of then-Restaurant Leader

Norman. [Doc. 24-3, Edwards Depo., pp. 18:16—19:22]; [Doc. 24-5, Norman Decl., ¶ 3].

Edwards began her second tenure working for Tacala in July 2020. [Doc. 24-3, Edwards Depo., pp. 36:22—37:12]; [Doc. 24-5, Norman Decl., ¶ 3]. Again, Norman—now the Area Coach—supervised Edwards, now a Restaurant Leader. [Doc. 24-5, Norman Decl., ¶ 3].

After Edwards began working, Norman suspected that Edwards might be pregnant. [*Id.* at ¶ 17]. Norman asked Edwards, and Edwards lied to her telling her she was not pregnant. [*Id.*]. After a few months, Edwards' sister, Tequila Coney, told Courtney Durham—another Tacala employee—that Edwards was, in fact, pregnant and, as these things go, Durham told Norman. [Doc. 24-3, Edwards Depo., pp. 97:22—98:14]; [Doc. 24-5, Norman Decl., ¶ 18].

Surprised that Edwards didn't tell her personally, Norman confronted Edwards and said, "look me in the eyes and tell me you're not pregnant." [*Id.* at ¶ 19]; [Doc. 24-3, Edwards Depo., p. 97:3–21]. Following this conversation, Edwards alleges that Norman said, "I never would have hired you if I had known you were pregnant!" [Doc. 24-3, Edwards Depo., p. 98:13–16]. Edwards also asserts that Norman said, "You shouldn't have a baby at your age." [*Id.* at p. 102:1–18]. After that conversation, Edwards then called Tacala's human resources hotline to report Norman's comments. [*Id.* at pp. 52:21—53:5]; [Doc. 25-3, Edwards Decl., ¶ 19].

Deborah Wilson—Area Coach and Norman's direct supervisor—also commented on Edwards' pregnancy during a visit to the restaurant. [Doc. 24-3, Edwards Depo., p. 108:8–18]. Wilson also remarked to other employees on another

occasion that Edwards needed to wear a girdle because of the size of her stomach. [Doc. 25-4, Coney Decl., ¶ 8].

A few days later, Norman saw Edwards and team member Ashlee Smith arguing in the restaurant. [Doc. 24-5, Norman Decl., ¶ 23]. Norman discovered that Edwards saw Smith on her cell phone while working and told Smith to lock her phone in the manager's office. [Doc. 24-3, Edwards Depo., p. 123:12–25]. Smith refused to put her phone away, so Edwards told Smith to clock out and go home for the day. [Doc. 24-4, p. 136]. Norman later intervened because company policy doesn't allow managers to take away team members' personal items and lock them in an office. [Doc. 24-5, Norman Decl., ¶ 26]. Even after Norman stepped in, Smith continued to berate Edwards with profanity. [Doc. 24-3, Edwards Depo., p. 123:12–25]. Norman spoke with Smith about the situation, and they decided Smith should go home for the day. [Doc. 24-5, Norman Decl., ¶ 26].

Smith continued to use profanity and argue when she returned to ask Norman a question about her schedule. [*Id.* at ¶ 29]. Even more, Smith's mother came inside to add to the commotion. [Doc. 24-4, p. 135]. Smith's mother then approached Edwards and threatened to fight her. [*Id.*]. Smith continued using profanity towards Edwards, culminating in Smith yelling "Fuck you, Tomeka," triggering Norman to terminate Smith's employment and escort Smith and her mother outside. [Doc. 24-4, p. 135]; [Doc. 24-5, Norman Decl., ¶ 30]. After they were outside, Edwards stepped out to check on

Norman, asking if she "was okay[.]" [Doc. 24-3, Edwards Depo., p. 124:10–23]. Norman told Edwards to go back inside. [*Id.*]. Edwards continued to discuss the altercation with another manager, leading Norman to instruct her to leave it alone and let it go. [Doc. 24-5, Norman Decl., ¶ 32]. Edwards didn't stop, and Norman decided to send her home to think about how she could have handled the situation differently. [*Id.*].

After leaving, Edwards contacted Kira Miller—Tacala HR/LP Field Coach—and Wilson. [Doc. 24-3, Edwards Depo., pp. 172:25—173:14]. Edwards complained that Norman sent her home and explained the situation, including her pregnancy and concerns that she experienced discrimination. [*Id.*]. Then Miller instructed Edwards, Norman, and the other manager on duty at the time to write and submit statements regarding the incident. [Doc. 24-4, pp. 133–136].

After both Smith and Edwards left, Smith continued the argument via Facebook and text messages. [Doc. 24-5, Norman Decl., ¶ 33]. Smith's texts contained profanity and vague threats aimed at Edwards and her children. [Doc. 24-4, p. 137].

Following these events, Tacala's Chief Compliance Officer, Angelique DeFranco, began an investigation. While it is unclear exactly when DeFranco became aware of Edwards' pregnancy, Edwards testified DeFranco knew about her pregnancy before the investigation and eventual termination. [Doc. 24-3, Edwards Depo., pp. 176:10—177:10]. After being sent home, but before being terminated, Edwards told DeFranco about Norman's comments and her concerns of discrimination. [*Id.*]. Still, DeFranco decided

to terminate Edwards' employment. [Doc. 24-6, DeFranco Decl., ¶¶ 16–17].

Norman contacted Edwards to set up a time to meet, and on November 29, Norman delivered Edwards the termination notice, dated November 25. [Doc. 24-5, Norman Decl., ¶¶ 40–41]. Edwards then contacted DeFranco and asked her to reconsider the decision. [Doc. 24-6, DeFranco Decl., ¶ 19]. DeFranco once again reviewed the documents and investigation materials and called Edwards to tell her the decision to terminate would remain in place. [*Id.* at ¶¶ 19–21].

Edwards filed a charge with the Equal Employment Opportunity Commission, which culminated in a right to sue letter issued on May 6, 2021. [Doc. 1, ¶ 4]. Edwards then filed her Complaint [Doc. 1] on June 29, 2021. Following discovery, Defendants filed this summary-judgment motion. *See* [Doc. 24]. Attached to her Response [Doc. 25], Edwards included two new affidavits—her own and one from her sister, Tequila Coney. *See* [Doc. 25-3]; [Doc. 25-4]. Defendants objected to the Court's consideration of these affidavits. *See* [Doc. 28-2]. With that in mind, the Court first reviews those objections before moving to the summary-judgment motion.

## OBJECTIONS

Defendants ask the Court to disregard and/or strike portions of declarations offered by Edwards in response to summary judgment. Defendants argue that the two declarations are inadmissible because, *inter alia*, they contradict prior sworn testimony, are irrelevant, provide conclusory statements and speculation, and contain inadmissible

hearsay. [Doc. 28-2, pp. 1–2].

To begin, the Court reviews the objections under Federal Rule of Civil Procedure 56(c)(2), which allows a party to object to cited material that cannot be presented in a form that would be admissible at trial. Fed. R. Civ. Pro. 56(c)(2); *see also Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).[1] When reviewing an affidavit under Fed. R. Civ. Pro. 56(c)(2), a court may disregard the entire affidavit or only specific portions that are improper. *Thomas v. Ala. Council on Hum. Rel.*, 248 F.Supp.2d 1105, 1112 (M.D. Ala. 2003).

Here, all of the objected-to statements can be presented in admissible form at trial. *See Macuba*, 193 F.3d at 1324. For example, Defendants object to parts of Tequila Coney's declaration as hearsay. The first allegedly offending statement is: "Olivia [Norman] was very upset about the pregnancy and told me 'I knew [Tomeka] was pregnant!' [. . .] 'I never would have hired her if I knew she was pregnant, they don't want to have to pay nobody for going out on maternity leave!'" [Doc. 32, p. 8]. However, Edwards can call Norman at trial to ask if she made this statement—that is the perfect example of evidence in an admissible form at trial, which is all this stage requires. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012). More importantly, this statement falls within the party-opponent exception to hearsay. *See*

---

[1] Importantly, the rule allows a court to strike evidence that **cannot** be presented in admissible form rather than material that **has not** been presented in that form at this stage. *See Abbott v. Elwood Staffing Serv.*, 44 F. Supp. 3d 1125, 1134 (N.D. Ga. 2014).

Fed. R. Evid. 801(d)(2)(D). Norman is an agent/employee of Tacala and hiring and firing clearly falls within the scope of that relationship. Therefore, her statement would also be admissible as an exception to hearsay.

As for Coney's second challenged statement, she offers that Norman told her "Deborah said Tomeka needs to put a girdle on because her stomach is too big." [Doc. 32, p. 9]. Defendants correctly point out this statement is double hearsay. [*Id.* at p. 10]. As double hearsay, the Court analyzes each statement separately. *See* Fed. R. Evid. 805. However, as discussed above, these statements could easily be admitted at trial by simply calling Norman and Wilson to testify at trial.

Defendants also object to Edwards' declaration based on inconsistencies with her prior deposition testimony. But a court is not required to strike every "minor discrepancy contained in an affidavit[.]" *Tippens v. Celotex, Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). Rather, the affidavit must "directly contradict[]" earlier testimony. *Van T. Junkins & Assoc., Inc. v. U.S. Indus, Inc.*, 736 F.2d 656, 657–58 (11th Cir. 1984).

At most, the discrepancies in the two statements are minor. For example, Defendants allege that Edwards' statements are inconsistent because in her declaration, she says she talked to human resources about Norman's statements, but in her deposition, she said she did not talk to human resources "like immediately at the time it happened[.]" [Doc. 32, p. 6]. Those two things are completely different. Saying you didn't report something *immediately* doesn't mean you didn't report it *at all*.

Defendants also object to parts of Edwards' declaration as irrelevant and immaterial. [Doc. 28-2, p. 5]. For example, Defendants argue that Edwards' statement regarding when she learned she was pregnant should be disregarded because it "adds no probative value to any claim, fact, or defense in this case." [*Id.*]. Interestingly, though, Defendants asked Edwards to testify to the same exact thing in her deposition. [Doc. 24-3, Edwards Depo., pp. 76:21—77:9 ("When did you find out that you were pregnant with the most recent pregnancy?")]. Edwards' pregnancy is the very premise of this entire action and, as such, the facts regarding when Edwards learned of her pregnancy and when she told Defendants are certainly relevant.

One final example comes in Defendants' objection to Edwards' declaration testimony that her manager occasionally helped her create the work schedules. [Doc. 28-2, p. 6]. Again, Defendants object that this information is irrelevant and immaterial. But once more, Defendants created the issue regarding Edwards' control of the schedule and labor budgets. *See* [Doc. 24-1, ¶ 9]. Defendants can't accuse Edwards of manipulating labor budgets and timecards and then say that her statement regarding a manager helping with those tasks is somehow irrelevant.

As for the rest of Defendants' objections, the Court reviewed each and determined none were of merit. Accordingly, the Court **OVERRULES** Defendants'

Objections and **DENIES** Defendants' Motion to Strike [Doc. 28-2].[2]

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[3] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial

---

[2] Notwithstanding this decision, the Court notes that the objected-to materials would not have changed the Court's ultimate decision on Defendants' summary-judgment motion.

[3] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323).

Rather, "the moving party simply may show—that is, point out to the district court—

that there is an absence of evidence to support the nonmoving party's case." *Four*

*Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively,

the movant may provide "affirmative evidence demonstrating that the nonmoving

party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party,

who must rebut the movant's showing "by producing . . . relevant and admissible

evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not

significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*,

477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's

position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by

Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for

the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## DISCUSSION

### A.  Title VII—Pregnancy Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Congress amended Title VII in 1978—through the Pregnancy Discrimination Act—to prohibit sex discrimination on

the basis of pregnancy. *See* 42 U.S.C. § 2000e(k).

### 1.   <u>Single-Motive Discrimination</u>

Like other Title VII actions, a plaintiff proceeding under a single-motive theory must prove discrimination by direct evidence or follow the *McDonnell Douglas* burden shifting framework to create an inference of discrimination. *See Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314–14 (11th Cir. 1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015).

### i.   <u>Direct Evidence</u>

Direct evidence is "evidence that, if believed, proves the existence of a fact without inference or presumption." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F,3d 1079, 1086 (11th Cir. 2004)). Direct evidence of discrimination is not typical. Rather, "only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence[.]" *Id.* As an example, the Eleventh Circuit offered a hypothetical memorandum reading: "Fire [Plaintiff]—he is too old." *Early v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also Dixon v. Hallmark Cos., Inc.*, 627 F.3d 849, 855 (11th Cir. 2010).

Edwards fails to present such direct evidence here. Rather, the evidence she offers—taken as truth—still requires an inferential leap. *See Damon v. Fleming Supermarkets Fla., Inc.*, 193 F.3d 1354 (11th Cir. 1999). Norman's comments that she

wouldn't have hired Edwards if she knew of her pregnancy and her lamenting over Edwards' impending maternity leave do not provide the direct evidence necessary to show discrimination without inference.

ii.    <u>**Prima facie case**</u>

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, "by proving, among other things, that she was treated differently from another 'similarly situated' individual[.]" *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc).  Then, a plaintiff's prima facie case may be rebutted by the defendant's proffer of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Finally, "should the defendant carry this burden, [a] plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination."  *Lewis*, 918 F.3d at 1221.

Put plainly, Edwards must show: "(1) [that] she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21 (citations omitted). Each element of the prima facie case is required. *Id.*

Let's start with the elements that are not disputed. Edwards is clearly a member of a protected class—she is a pregnant woman. *See Durham v. Rural/Metro Corp.*, 955

13

F.3d 1279, 1286 (11th Cir. 2020); *see also* 42 U.S.C. § 2000e(k). Defendants do not argue

Edwards wasn't qualified for her position. *See generally* [Doc. 24-2]. And she faced an

adverse employment action—Defendants terminated her employment. [Doc. 24-1, ¶ 50].

Defendants quibble with the last element, arguing that Edwards cannot show Tacala

treated any other similarly situated comparator differently. [Doc. 24-2, p. 4].

The Eleventh Circuit requires plaintiffs to show a comparator that is "similar in

all material respects." *Lewis*, 918 F.3d at 1218. The en banc Eleventh Circuit elaborated

that a "plaintiff and her comparators must be sufficiently similar, in an objective sense,

that they 'cannot be reasonably distinguished.'" *Lewis*, 918 F.3d at 1228 (quoting *Young*,

575 U.S. at 230–31).

Here, Edwards offers one comparator: Matthew Newkirk. Newkirk—who was

not pregnant—served as the Restaurant Leader immediately preceding Edwards. [Doc.

24-3, Edwards Depo., pp. 142:17—143:17; 209:10—210:5]. As Restaurant Leader,

Newkirk and Edwards shared responsibilities, job titles, and other material aspects of

the job. *Lewis*, 918 F.3d at 1227–28. More specifically, Edwards and Newkirk worked

under the exact same supervisor (Norman), in the exact same restaurant, in the exact

same role, under the exact same policies, guidelines, and rules; indeed, Newkirk trained

Edwards and their roles overlapped. [Doc. 25, p. 10].

Edwards and Newkirk also participated in similar misconduct. Edwards testified

that Newkirk threw ketchup packets and drinks at a customer. [Doc. 24-3, Edwards

Depo., pp. 142:17—143:17 ("[H]e'd taken ketchup packages and sodas and [thrown] them out at customers [. . .]. [H]e [. . .] took a cup and threw it at a customer.")]. Even more, Edwards testified that Newkirk threw a drink at another employee who allegedly threatened him. [*Id.* at pp. 209:10—210:5 ("[Matthew] threw the cup out the window at the employee.")]. While not exactly the same, in Defendants' own terms, both acts are unprofessional. [Doc. 28, p. 8]. To be sure, based on Edwards' testimony, both Norman and Tacala's human resources department knew of the incidents involving Newkirk. [Doc. 24-3, Edwards Depo., p. 143:3–7 ("[T]hey reviewed the cameras with HR [. . .] Olivia told me about it. [Newkirk] told me about it.")].

In the end, after viewing the evidence in Edwards' favor, the Court finds that Newkirk and Edwards are similarly situated in all material respects such that Newkirk is a proper comparator. *Lewis*, 918 F.3d at 1227–28.

For the final element of her prima facie case, Edwards must show that Defendants treated Newkirk more favorably. That burden is not hard to carry here. Defendants didn't fire Newkirk. Rather, Newkirk later resigned (for other reasons) but then, according to Edwards' testimony, returned to work for Defendants. [Doc. 24-3, Edwards Depo., pp. 142:17—143:17; 209:10—210:5]. Defendants even admit they didn't terminate Newkirk. *See* [Doc. 28, p. 8]. However, Defendants did fire Edwards.

Therefore, the Court finds that Edwards established a prima facie case.

### iii.    **Legitimate, Non-discriminatory Reason**

After a plaintiff successfully establishes a prima facie case, the burden shifts to

the employer to "articulate a legitimate, non-discriminatory reason" for the adverse

action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). In evaluating the

proffered reason, great deference is given to the employer—so long as the reason does

not include discrimination. To be sure, the employer can take adverse action against an

individual for "a good reason, a bad reason, a reason based on erroneous facts, or for no

reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY*

*Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Here, Defendants allege that they terminated Edwards for being "insubordinate

and unprofessional." [Doc. 28, p. 8]. The official termination notice gives the following

reason: "Tomeka engaged in inappropriate behavior and refused to follow reasonable

instructions by a member of management[] and exhibited disruptive and threatening

behavior." [Doc. 25-3, p. 38]. By all accounts, that is a legitimate, non-discriminatory

reason.

### iv.    **Pretext**

The real fight comes next. Even after a defendant carries its burden of

articulating a legitimate, non-discriminatory reason for the adverse action, a plaintiff

has another chance to show discriminatory motive. To do so, a plaintiff must produce

evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given

by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). If a plaintiff fails to show enough evidence to create a genuine issue of material fact as to each proffered reason, "[a] defendant is entitled to summary judgment." *Chapman v. Al Transp.*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (en banc).

To begin, Defendants argue that Tacala doesn't tolerate threatening behavior or violence, and it treats everyone who violates that policy the same. *See generally* [Doc. 28]; [Doc. 24-6, DeFranco Decl., ¶ 26]; [Doc. 24-1, ¶ 13]. But the record isn't so clear on that point.

Tacala's own investigation record shows over 20 instances of employee altercations—both with other employees and with customers. [Doc. 24-4, pp. 150–152]. The investigation record also shows a clear pattern: most employees—especially higher-level team members like Edwards—received warnings before termination. For example, Edwards testified that Eugenia Jackson, a shift leader, and another employee engaged in a physical altercation. [Doc. 24-3, Edwards Depo., pp. 209:10—210:5]. Defendants' own records support that, too. *See* [Doc. 24-4, p. 150]. After that altercation, Jackson— the more senior employee—received a final warning. [*Id.*]. Again, Lucy, an assistant leader, received a warning after an altercation. [*Id.* at p. 151]. Ebone Lewis, a shift leader, received a written warning after an altercation. [*Id.*]. Again, Lavonte Ates, a personal trainer, received an acknowledgment document after a physical altercation.

[*Id.*]. While these individuals are not comparators for purposes of Edwards' prima facie case,[4] it does point to "inconsistency, incoherency, [and] contradiction in the proffered reason[.]" *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

Notwithstanding those individuals who are not comparators, the Court focuses in on Newkirk. Defendants attempt to rebut Newkirk as a comparator—and therefore, Edwards' argument of pretext—by arguing that Newkirk did not engage in a physical altercation with another employee, did not throw any item at another employee, and Tacala didn't terminate him. [Doc. 28, p. 8]. Defendants cite to Norman's declaration to support such conclusions; however, Norman's declaration is not dispositive on the matter. Rather, she asserts that she is "*not aware* of any incident in which Matthew Newkirk [. . .] threw ketchup packets, cups, drinks, or any item at a customer[.]" [Doc. 24-5, Norman Decl., ¶ 35 (emphasis added)]. She continues, "I am not aware of any employee verbally or physically threatening Matthew Newkirk[.]" [*Id.*]. But Defendants' own records tell a different story. The investigation records show that on March 23, 2020, another employee threatened Newkirk. [Doc. 24-4, p. 152]. The report also shows "no notes, no resolution," as the investigation result. [*Id.*]. Even more, Norman's statement that she "is not aware of" any incidents involving Newkirk does not mean there were no incidents involving Newkirk. Following this, all that remains is Edwards' testimony that Newkirk engaged in unprofessional conduct, Tacala knew,

---

[4] There is no evidence on these employees' pregnancy status during the incidents.

and Tacala didn't terminate him. Indeed, it's unclear if Newkirk received any discipline.

Also, Defendants' shifting reasons for terminating Edwards can shed light on possible pretext. *See Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 210 (11th Cir. 2008). First, the termination letter clearly delineated that the incident on November 23, 2020, sparked the termination. *Id.* The letter doesn't mention prior incidents or a pattern of insubordination, but that is now what Defendants argue. [Doc. 24-2, p. 7]. Defendants contend that employees complained that Edwards created a hostile work environment and that Norman counseled Edwards on these issues. [Doc. 24-1, ¶ 14]. But Edwards' testimony rebuts that assertion. Edwards testified that Norman never counseled her regarding her attitude or the supposed hostile work environment. [Doc. 24-3, Edwards Depo., p. 69:3–22]. Additionally, Edwards never received a write-up or disciplinary action. [*Id.* at p. 106:3–16]. While Tacala's employment manual makes it clear that all employees are at will, it does lay out that warnings are available to counsel and guide employees. [Doc. 24-4, p. 81]. And the pattern discussed above shows that the applications of these policies are "inconsistent and arbitrary," and could be evidence of pretext. *Williams v. City of Valdosta*, 689 F.2d 964, 975 (11th Cir. 1982). Even as Tacala contends that it prohibits threatening behavior, etc., its inconsistent application of that policy questions the veracity of its commitment to actually preventing such behavior. *See Berg v. Fla. Dep't of Lab. & Emp. Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998).

Even more confusing still is that Tacala allowed Edwards to come back to work

for a day during the investigation. [Doc. 24-3, Edwards Depo., p. 172:17–24]. If Edwards' professionalism and insubordination concerned Tacala so much, it seems that it wouldn't want Edwards back in its restaurant at all.

Tacala's final—and somewhat overarching—argument is that DeFranco, the proffered decisionmaker, did not know that Edwards was pregnant and therefore could not have discriminated against her for being pregnant. [Doc. 28, p. 9]. However, Edwards testified that she spoke to DeFranco "before and after" her termination. [Doc. 24-3, Edwards Depo., p. 176:7–25]. Further, Edwards testified that she talked with DeFranco about her pregnancy. [*Id.* at pp. 180:24—181:2 ("I spoke with [DeFranco] about my pregnancy.")]. Therefore, any argument Tacala offers based on DeFranco's lack of knowledge is—at best—disputed.

Even more, Wilson—another member of Tacala's management—admits that she knew of Edwards pregnancy. [Doc. 24-8, Wilson Decl., ¶ 4]. In fact, Wilson commented on Edwards' pregnancy during a visit to the restaurant. [Doc. 24-3, Edwards Depo., p. 108:8–18]. There is also evidence that Wilson commented on the size of Edwards' stomach, asserting that she needed to wear a girdle. [Doc. 25-4, Coney Decl., ¶ 8]. Miller—also in management—admits to speaking to Edwards between her suspension and termination. [Doc. 24-7, Miller Decl., ¶ 6]. While it is unclear exactly what they discussed, Edwards testified that she told Miller "what was going on." [Doc. 24-3, Edwards Depo., pp. 172:25—173:6]. Edwards also testified that she called the Tacala

human resources hotline to report Norman's comments near the time it occurred. [*Id.* at pp. 52:21—53:5]; [Doc. 25-3, Edwards Decl., ¶ 19]. Norman also mentioned Edwards' pregnancy to other managers at other stores, like Beverly Davis—a manager at another Tacala-operated Taco Bell location. [Doc. 24-3, Edwards Depo., pp. 112:22—113:9]. All of this evidence—read in Edwards' favor—shows that DeFranco, Miller, Wilson, Norman, and others in Tacala's management knew of Edwards' pregnancy before terminating her.

Edwards successfully attacked Tacala's proffered reasons and called into question the credibility and veracity of the termination decision. A reasonable jury could conclude that Norman didn't like Edwards' pregnancy and didn't want to pay her during maternity leave. That is sufficient evidence to show pretext. *See Chapman*, 229 F. 3d at 1034; *Brockman v. Avaya, Inc.*, 545 F. Supp. 2d 1248 (M.D. Fla. 2008). The remaining question of whether one believes Edwards or Tacala's representatives remains the sole province of a jury. *Brockman*, 545 F. Supp. 2d at 1256.

### v.   <u>Convincing Mosaic</u>

Assuming the Court got it wrong regarding Edwards' prima facie case under *McDonnell Douglas*, Edwards has other arrows in her procedural quiver. First, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*").

Presentation of a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination "will always" preclude summary judgment in these types of cases. *Id.* (citation omitted). And a plaintiff can present a "convincing mosaic" if she can put forth evidence that demonstrates "suspicious timing, ambiguous statements [. . . ,] and other bits and pieces from which an inference of discriminatory intent might be drawn"; "systematically better treatment of similarly situated employees"; and "that the employer's justification [was] pretextual." *Id.* (citation omitted). Not to replow old ground, but Edwards presents several pieces of evidence that piece together such a convincing mosaic.

First, Edwards provided evidence of several statements that cause the Court serious concern. First, her supervisor, Norman, unequivocally admitted she would not have hired her if she knew of the pregnancy. Norman continued that Edwards was too old to be pregnant and expressed concern about paying Edwards during maternity leave. [Doc. 25-2, ¶ 6]. A reasonable jury could certainly take these statements as evidence that Norman was hostile to Edwards' pregnancy and acted on that hostility. Only two weeks after learning of Edwards' pregnancy, Tacala  terminated Edwards for an offense that only merited a warning to employees who weren't pregnant. [*Id.* at ¶¶ 26, 30]. Norman signed the termination notice and delivered the news—not DeFranco, who Tacala contends made the final decision. [Doc. 24-4, p. 138].

Taking these facts together, along with the pretext discussion above, a reasonable jury could infer that Tacala intentionally discriminated against her because she was pregnant. *See Lewis II*, 934 F.3d at 1189.

## 2.      Mixed-Motive Analysis

Edwards' Complaint does not clearly allege a mixed-motive theory of the case. But, her Response to this motion does. That is enough to put Defendants on notice that she is proceeding under such a theory.[5] To be sure, Defendants responded to a mixed-motive argument in its Reply [Doc. 28]. *See* [Doc. 28, p. 4 ("Edwards's Pregnancy Was Not a Motivating Factor.")]. Therefore, the Court proceeds with a mixed-motive analysis.[6]

To begin, the mixed-motive analysis is not as taxing as the *McDonnell Douglas* single-motive framework. Indeed, all a plaintiff needs to do to survive summary judgment under a mixed-motive theory is show: "(1) the defendant took an adverse action against the plaintiff, and (2) [a protected characteristic] was a motivating factor

---

[5] *See Williams v. Fla. Atlantic Univ.*, 728 F. App'x 996, 999 (11th Cir. 2018) ("A plaintiff is not required to 'label her case as either a pretext case or a mixed motives case from the beginning[,]' [rather, a plaintiff] is only required to argue that her case involved mixed-motives 'at some point in the proceedings.'") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12); *Williams v. Housing Auth. of Savannah, Inc.*, 834 F. App'x 482, 489 (11th Cir. 2020) ("While [Plaintiff] was not required to plead a mixed-motive theory in her complaint, she failed to raise any argument along those lines in her [response to summary judgment.]"); *see also Powell v. Birmingham Heart Clinic, P.C.*, No. 2:19-cv-00309-MHH, 2021 WL 4171350, at *7 n.8 (N.D. Ala. Sept. 14, 2021) (discussing the two theories of Title VII cases, and holding the plaintiff is under no obligation to "plead one or the other in her complaint.").

[6] *See Vargas v. Michaels Stores, Inc.*, No. 8:16-cv-1949-T-33JSS, 2017 WL 31741058, at *2 (M.D. Fla. July 26, 2017) (holding that the defendant was aware of a mixed-motive theory based on the plaintiff's response to summary judgment, even if the complaint did not allege such a theory).

for the [adverse action]." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016). The question, then, is broader and more forgiving: did the plaintiff provide sufficient evidence to establish a genuine, triable issue concerning the defendant's discriminatory intent? *Id.* Based on the discussion outlined above, Edwards does.

Edwards presented circumstantial evidence—taken as true—showing (1) that Tacala treated her differently from other employees who were not pregnant for the same or worse conduct; (2) her supervisor who later reported her for insubordination and unprofessionalism earlier said she wouldn't have hired her had she known of the pregnancy; (3) the same supervisor made comments showing concern for Tacala paying for Edwards' maternity leave; (4) the decisionmakers were aware of her pregnancy; and (5) she had not received earlier warnings or write-ups for disciplinary actions.

Tacala's only true argument against a mixed-motive theory is that DeFranco did not know Edwards was pregnant. But, as established above, Edwards rebuts that with her own testimony that DeFranco did know she was pregnant. Choosing who to believe is a task for a jury, not the Court at this stage. *See Anderson*, 477 U.S. at 255. Otherwise, Tacala again argues, under the motivating factor heading, that Edwards fails to present direct evidence of discrimination. The Court agrees. But to be clear: direct evidence is not required to establish a mixed-motive case. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

Taking all of this evidence together, there is at least an inference of

discrimination that a jury must decide. *See Quigg*, 814 F.3d at 1242 ("[T]aken together and in the light most favorable to [the plaintiff], the statements establish a jury issue[.]").

While it may be true that this "suit presents no facts which indicate a landslide victory for [Edwards], it is equally true that[, she] is entitled to have a jury resolve the issue." *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1337 (M.D. Ala. 2000). Accordingly, the Court **DENIES** summary judgment as to Edwards' Title VII pregnancy discrimination claim, and it will proceed to trial.

**B.      ADA**

To establish a prima facie case of discrimination under the ADA, a plaintiff "must show: (1) he is disabled; (2) he is a qualified individual; (3) and he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Ind., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007). Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more life activities[.]" 42 U.S.C. § 12102(1)(a). That means that the "mere existence of a physical impairment does not constitute a disability under the ADA;" rather, the statute requires that the impairment must also "substantially limit a major life activity." *Jones v. Wireless Time Ala., LLC*, No. 2:21-00613-KD-B, 2022 WL 414377, at *7 (S.D. Ala. Feb. 10, 2022). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

But it is clear that pregnancy itself, absent some other circumstance, is not a disability. *See Penaloza v. Target Corp.*, 549 F. App'x 844, 848 n.2 (11th Cir. 2013). In order for pregnancy to fall within the ADA's protections, there must be some impairment separate from a healthy pregnancy. *See Mayorga v. Alorica, Inc.*, No. 12-21578-CIV, 2012 WL 3043021, at *5 (S.D. Fla. July 25, 2012).

Here, Edwards argues that her pregnancy exacerbated her pre-existing diabetes and caused her to be hospitalized for two days. [Doc. 25, p. 12]. However, Edwards also admitted that her pregnancy and related impairments did not affect her ability to work, eat, sleep, care for her children, or otherwise "prevent [her] from doing anything in [her] normal life[.]" [Doc. 24-3, Edwards Depo., pp. 88:22—89:10]. Thus, Edwards cannot show any substantial limitation on a major life function, and therefore fails to show that any purported impairment, including her pregnancy, rises to the level of a disability under the ADA. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219 (11th Cir. 2000).

Accordingly, the Court **GRANTS** summary judgment as to Edwards' ADA disability claims.

## C.    <u>Retaliation</u>

Title VII prohibits employers from retaliating against employees who oppose "any practice made an unlawful practice" under Title VII, or against employees who "participate in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). Almost identically, the ADA prohibits discrimination against those who report or participate in

investigations of reported violations of the ADA. *See* 42 U.S.C. 12203(a). Because of the similarities, the Court evaluates the two retaliation claims under the same framework. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287.

To establish retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relationship between the two events." *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). Again, in the Title VII framework, once the prima facie case is set forth, the employer can provide a legitimate, non-retaliatory reason for the decision. Then, the plaintiff can offer evidence to show that the proffered reason is pretext. *Id.*

While discussions with human resources can be protected activity, Plaintiff must have "explicitly or implicitly communicat[ed] a belief that the practice constitutes unlawful employment discrimination," to establish protected expression. *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (internal citations omitted). There is conflicting evidence on the issue of Edwards' protected activity. On one hand, Edwards testified that she told Miller and DeFranco, along with Tacala Human Resources generally, that she experienced discrimination based on her pregnancy *before* her termination. [Doc. 24-3, Edwards Depo., pp. 172:13—177:2]. On the other hand, Miller and DeFranco deny any knowledge of Edwards' pregnancy until *after* her termination. [Doc. 24-7, Miller Decl., ¶ 9]; [Doc. 24-6, DeFranco Decl., ¶ 18]. The Court's role here is

not to determine the credibility of either witness or the veracity of the stories they offer. As required at this stage,[7] the Court believes the evidence of the non-movant and finds that—for purposes of the prima facie case—Edwards participated in protected activity.

Even accepting the above determination, Edwards fails to show a causal connection between that activity and her later termination. To establish that connection, Plaintiff must show that "had she not [engaged in the protected conduct], she would not have been fired." *Gogel*, 967 F.3d at 1135 (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)). In *Gogel*, the Eleventh Circuit was clear: "it is the plaintiff's burden to provide evidence from which one could reasonably conclude that *but for* her alleged protected act, her employer would not have fired her." *Id.* at 1135 (emphasis added).

Here, Edwards fails to offer any evidence of causation. Instead, she primarily argues that her pregnancy caused her termination—not her protected activity. While her circumstantial evidence may preclude summary judgment on her Title VII claim, Edwards doesn't offer any evidence to show that *but for* her protected activity, she would not have been fired. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (11th Cir. 2013). Rather, she argues throughout her briefs that her pregnancy was the reason for her termination. While that may suffice for her Title VII claim, it does not support a retaliation claim, too.

---

[7] *Anderson*, 477 U.S. at 249, 255.

Accordingly, the Court **GRANTS** summary judgment as to Edwards' retaliation claims.

### D.     <u>Georgia Law Claims</u>

Finally, Edwards asserts two state-law claims: negligent hiring, retention, and supervision and intentional infliction of emotional distress. [Doc. 1, pp. 17–20]. Citing to O.C.G.A. § 34-7-20, Edwards argues that "[e]mployers must exercise ordinary care in the selection/retention of employees," to support her claim for negligent hiring, retention, and supervision claim. Even though O.C.G.A. § 34-7-20 deals with whether an employer may be liable for hiring or retaining an employee the employer knows is not suited for the particular employment, "Plaintiffs essentially attempt to create a [state-law] negligence cause of action for discrimination in employment." *Graham v. City of Duluth*, 759 S.E.2d 645, 650–51 (Ga. Ct. App. 2014); *Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1372 (M.D. Ga. 2002).

Judge Land perfectly addressed this exact issue:

> Acceptance of Plaintiffs' creative legal theory would result in making virtually every employment discrimination claim actionable under [state-law] negligence principles. If the State of Georgia desires or intends to provide its citizens with a [state-law] remedy for employment discrimination, it has the means to do so through legislation enacted by the Georgia General Assembly. Absent a statutory or clear common law duty, th[e] Court has no authority to abandon judicial restraint and create a new [state-law] cause of action for employment discrimination.

*Alford*, 209 F. Supp. 2d at 1372. Accordingly, Defendants are entitled to summary judgment on Edwards' state-law claim for negligent hiring, retention, and supervision.[8]

As for Edwards' intentional infliction of emotional distress claim under Georgia law, she claims that "Defendants' statements, conduct, and behavior towards Edwards were intentional and reckless, extreme and outrageous, causing [. . .] shame, humiliation, [and] emotional distress[.]" [Doc. 1, ¶ 62]. Nevertheless, as a question of law, the Court concludes that Defendants' actions are not akin to the "sufficiently outrageous and egregious" conduct required for this type of claim under Georgia law. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (noting that Georgia courts have held that an employee's termination—"'however stressful to the employee'—generally is not extreme and outrageous conduct").

Accordingly, the Court **GRANTS** summary judgment as to Edwards' Georgia law claims.

## CONCLUSION

Based upon the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [Doc. 24]. The Court **GRANTS** summary judgment as to Edwards' ADA, Title VII retaliation, and state-law intentional infliction

---

[8] *See Holston v. Sports Auth., Inc.*, 136 F. Supp. 2d 1319, *adopted in pertinent part*, 136 F. Supp. 2d 1319 (N.D. Ga. 2000), *aff'd without op.*, 251 F.3d 164 (11th Cir. 2001) (explaining that a claim for negligent hiring or retention based upon racial discrimination fails to state a claim under Georgia law, noting that negligence claims can arise only from common law duties, and there is no common law duty to prevent discrimination in employment).

of emotional distress and negligent hiring and supervision claims against Defendant Tacala Georgia Corp. The Court **GRANTS** summary judgment as to Edwards' state-law claim for intentional infliction of emotional distress against Defendant Olivia Norman.[9] The Court **DENIES** summary judgment as to Edwards' Title VII discrimination claim regarding her pregnancy.

The Court notes that discovery concluded on May 27, 2022, and the deadline for dispositive motions passed on July 8, 2022. [Doc. 20]; [Doc. 23]. As such, this case is now ready for trial. Therefore, the Court sets this case for trial in the December term, which begins on December 12, 2022. The Court will provide a separate order advising the parties of the time for the pre-trial conference and the submission of a pre-trial order.

**SO ORDERED**, this 5th day of October, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[9] Because that is the only claim against Norman, the Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendant Oliva Norman as a party to this action.